E-FILED
Wednesday, 16 November, 2005  11:12:23 AM
Clerk, U.S. District Court, ILCD

# United States District Court
## Central District of Illinois

FILED

NOV 1 6 2005

JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

Micah L Yarborough – R34632,
Petitioner
-Vs-
Steven M. Mensing, Warden
Vandalia Correctional Center,
Respondent

Case# 1:05-cv-1231

Judge: Joe Billy McDade

# Brief in Support of
# Petition For Writ of Habeus Corpus

Micah Yarborough
P.O. Box 500 Route 51
Vandalia, IL 62471

# Table of Contents

Table of Contents ...............................................................................1
Index of Authorities ........................................................................... 2
Statement of Questions ......................................................................3
Statement of Facts Surrounding Case ........................................................4
Argument ......................................................................................7

I.    Petitioner was denied Equal Protection of the Laws by the repeated coercion
      and intimidating threats which caused accused's will to be overborne from the
      McLean County Sheriff's Department resulting in an unjust self-incriminating
      statement.

II.   Petitioner was denied Due Process and Equal Protection of the Laws by the
      prosecution for the failure to include partial pretrial statements given by the
      Petitioner in Pre-trial Discovery violating Discovery Orders.

III.  The prosecution violated petitioner's right to a Fair Trial by the acceptance of
      perjured testimony given by the alleged victim and expert witness and the
      entry of falsified evidence.

IV.   Petitioner had Ineffective Assistance of Counsel in the Trial Court by his
      attorney's failure to make proper motions and objections and perform
      adequate cross-examination.

Relief Requested ...............................................................................12
Appendices:

    a.  Order of Sentence
    b.  Letters of Character:
        1.  Errol "Romo" Romero – Former Iberia Parish Sheriff and Current
            Louisiana State Representative.
        2.  Amanda Leah Grissom – Petitioner's Mother
        3.  Lloyd Clayton Yarborough – Petitioner's Father
        4.  Jaime Cagley – Petitioner's Fiancé
        5.  Lee Ann S. Hill – Petitioner's Public Defender
        6.  Crystal Thielen-Harris – Mother of Petitioner's Child

    c.  Petitioner's Resume
    d.  NCSF (National Coalition of Sexual Freedom) Presentation
        "SM Issues for Healthcare Providers"
        Susan Wright – Policy Director of the NCSF
        Dr. Ruth W. – Neurologist
    e.  Femme: The Magazine  (Dr. Lipstick Article)
        Dr. Lipstick – Name Unavailable - Public Health M.D. – Seattle, Wa
    f.  San Francisco Sex Information: Definition of Fisting

1

# Index of Authorities

| Authority | Page |
|---|---|
| Gladden v. Unsworth, C.A.Or 1968, 396 F.2d 373. | 7 |
| C.A.8 (Ark.) 1998. U.S. v. Ingle, 157 F.3d 1147 | 7 |
| Haynes v. State of Wash., Wash 1963, 83 S.Ct 1336, 373 U.S. 503, 10 L.Ed.2d 513. See also Lynumm v. State of Ill., Ill 1963, 83 S.Ct. 917, 372 U.S. 528, 9 L.Ed.2d 922; Townshend v. Henderson, C.A.Tenn. 1968, 405 F.2d 324; Barnes v. State 1950, 229S.W.2d 484, 217 Ark. 244. | 7 |
| U.S.C.A. §840  Apodaca v. U.S.,C.A.N.M.1951, 188 F.2d 932. | 8 |
| U.S.C.A. §2422  U.S. ex rel. Hudson v. Cannon, C.A.ILL.1976, 529 F.2d 890. | 8 |
| U.S.C.A. 14 §2425  LaFrance v. Bohlinger, D.C. Mass.1973, 365 F. Supp. 198 | 7, 8 |
| C.A. 7(ILL.) 1997. & U.S.C.A. Const. Amend. 14  Watson v. Detella, 122 F.3d 450. | 8 |
| C.A.D.C.1988. U.S.C.A. Amends 5,6. U.S. v. Yunis, 859 F.2d 953 273 U.S. App D.C. 290. | 8 |
| U.S.C.A. Const. Amend. 14 §2442  Sessions v. Wilson, C.A.Cal.1966, 372 F.2d 366. | 9 |
| C.A.7 (ILL.) 1998. 18 U.S.C.A. §1623 – U.S. v. Fowley, 137 F.3d 458. – Perj 3. | 9 |
| U.S.C.A. §2457 Reck v. Pate, ILL. 1961, 81 S.Ct. 1541, 367 U.S.433, 6 L.Ed.2d 948. | 10 |
| U.S.C.A. 6 | 11 |
| 28 U.S.C. §2254 | 12 |

Brief in Support of Petition For Writ of Habeas Corpus

# Statement of Questions Presented

I.     Whether Petitioner was denied Equal Protection of the Laws by the repeated coercion and intimidating threats which caused accused's will to be overborne from the McLean County Sheriff's Department resulting in an unjust self-incriminating statement.

Petitioner Answers "Yes."

II.    Whether Petitioner was denied Due Process and Equal Protection of the Laws by the prosecution for the failure to include partial pretrial statements given by the Petitioner in Pre-trial Discovery violating Discovery Orders.

Petitioner Answers "Yes."

III.   Whether the prosecution violated Petitioner's right to a Fair Trial by the acceptance of perjured testimony given by the alleged victim and expert witness and the entry of falsified evidence.

Petitioner Answers "Yes."

IV.    Whether Petitioner had Ineffective Assistance of Counsel in the Trial Court by his attorney's failure to make proper motions and objections and perform adequate cross-examination.

Petitioner Answers "Yes."

Brief in Support of Petition for Writ of Habeas Corpus

## Statement of Facts Surrounding Case

Micah L. Yarborough being first duly sworn, does say and depose the following:

1. On February 19, 2004, Katherine Rueb and Petitioner successfully attempted the intimate act of fisting.
2. On March 5, 2004, Katharine Rueb informed Petitioner that she was pregnant. She showed no proof and had made similar claims in the past, repeatedly.
3. On March 12, 2004, I received a phone call from Ms. Rueb enroute to Louisiana to visit family. She stated that she had decided to get an abortion at Granite City. I told her that this was a good idea due to her recent abuse of prescription medication and alcohol.
4. On March 15, 2004, Ms. Rueb arrived at my parents' residence in Louisiana.
5. Ms. Rueb informed my stepmother that she was pregnant. My stepmother did not believe her and relayed this information to me. My stepmother warned me of Ms. Rueb's obvious obsession and told me to be careful.
6. At that point I dropped the issue, and it was brought up no further.
7. On March 17, 2004 MS. Rueb and I arrived back in Danvers at her residence from Louisiana.
8. I attended a pool tournament and card game afterward at my friend's house until the early morning of March 18.
9. At approximately 4:00am, March 18, 2004, Ms. Rueb and I entered into consensual sexual congress, and attempted the act of fisting again.
10. She was injured with a laceration to the vagina, and began to bleed.
11. Neither of us knew that she was injured, and during the course of our congress she stated, "I'm going to cum."
12. A few moments passed and she told me that something was wrong, at which time I withdrew from our intimacy and turned on the light.
13. With the light on I noticed blood on the bed and became frantic. I ran to the phone and began to call anyone who could help.
14. I did not call 911 because I was hysterical and not thinking clearly.
15. I was able to reach Ms. Rueb's sister, Amelia Roehm, who told me she was on her way.
16. Ms. Roehm arrived and calmed me down. She did not note any extreme seriousness to the situation and stated it might be menstruation. She then put on a pot of coffee.
17. I contacted EMS by calling 911.
18. When the ambulance arrived, I assisted EMS by helping them to get Ms. Rueb to the ambulance.
19. After the ambulance left, Ms. Roehm and I took three of Ms. Rueb's four children to their grandmother's house.

4

20. We arrived at the hospital minutes before Ms. Rueb's procedure. She was not fearful and the nurse was very polite and had no questions or suspicion of any violence.

21. The nurse suggested that I go home and get some rest, and said she would call me soon.

22. At approximately 1:00 p.m., I received a phone call from the nurse stating that Ms. Rueb was OK and wanted to see none but me.

23. When I arrived at the hospital I was informed that Ms. Rueb was on a Morphine drip and would be spacey.

24. Ms. Rueb and I spoke in the presence of Ms. Roehm not discussing any of the events related to the incident. Ms. Rueb began to doze and fell asleep in my arms. I went home shortly afterward.

25. On March 19, 2004, I went back to the hospital to visit Ms. Rueb and was informed that the Sheriff's Department was looking for me. I called them immediately.

26. Detective Joe Zoeller met me at my residence and asked if I would give a statement, at which time I agreed and we proceeded in his vehicle to the Sheriff's Station.

27. After seated in the interrogation room, I told him that Ms. Rueb's injury was accidental, with no malicious intent whatsoever.

28. He began questioning me, asking very rude questions and making very rude gestures. He treated me as though I was guilty already and a freak.

29. I held my ground until he became very agitated and began to become intimidating, using his authority in an attempt to scare me. His actions were very coercive and his rage, temper, and intimidation got the best of me.

30. After hours of such mental assaults and abuse I gave him a false confession after he threatened to charge me with attempted murder if I did not. He told me that I would get probation if I confessed so I should make it easy on myself.

31. I was then taken into custody.

32. I pled not guilty at pre-trial and was given a bond reduction.

33. Ms. Rueb came to visit me at the McLean County Jail, and told me that she knew her injury was accidental and was sorry, and that she would bond me out as soon as she could.

34. Ms. Rueb bonded me out of Jail.

35. Ms. Rueb filed an affidavit with my public defender to squash the Order of Protection that had been imposed on me which was denied.

36. Ms. Rueb secured a marriage license and we both signed it at the McLean County Town Hall building, under witness of the clerk.

37. I spoke with my attorney Lee Ann S. Hill a few days before trial, and she told me if I did not plea out with the State, that I would be found guilty and sentenced to seven years.

38. I changed my plea to guilty in hope of probation and fear of further threat from the Sheriff's Department.

39. Ms. Rueb went to Fort Myers, Florida to look for residence and employment, and I regularly sent her money and her and her children's prescriptions.

40. I ended our relationship due to her drug and alcohol abuse.

5

41. Upon her return, she overdosed on her prescription medication and alcohol and was admitted for treatment for attempted suicide. As a result, DCFS took Ms. Rueb's children into their custody for their protection.

42. Ms. Rueb became infuriated at the news that I was seeing someone else upon her release, and began to make threatening phone calls to my family. She stated that she would "hang me" in court no matter what the truth was, to see that I went to prison.

43. She told my mother, "If I can't have him, nobody will."

44. I began a relationship with Jaime Cagley who is now my Fiancé', and has a four-year-old daughter.

45. On November 22, 2004, I was sentenced to 4-1/2 years in the IDOC, despite testimony from my family and Mrs. Cagley, and letters of impeccable character from various sources (See Appendices).

46. During the sentencing Ms. Rueb gave a statement, under oath, full of lies and ammunition directed at me. I could not contact Susan Myer of DCFS at the time to testify against Ms. Rueb's perjury, as she had written her statement immediately before the sentencing trial was to take place.

47. Evidence from Petitioner's jail property, which has always been and still is in Ms. Rueb's possession, was entered at sentencing. Ms. Rueb stated that this evidence, songs and poetry written while in custody was mailed to her while she was in Fort Myers. No time was given to prepare for this new evidence that in fact had not been mailed to her, but was in her possession since my release from the county jail.

6

# **Argument**

On March 19, 2004, Detective Joe Zoeller responded to a complaint made by Bromenn Hospital, for a possible battery. Zoeller proceeded to the hospital and took a statement from the alleged victim, Katherine Rueb, while she was under the influence of Morphine. Police questioned her for 3 hours and took only 20 minutes of tape, which aroused suspicion of coercion.

> "If by reason of mental illness, use of drugs, or extreme intoxication, confession in fact could not be said to be the product of rational intellect and freewill, it is not admissible, and its reception in evidence constitutes a deprivation of due process."U.S.C.A. 14 § 2429 Gladden v. Unsworth, C.A.Or 1968, 396 F.2d 373.

> "Evidence coerced from a witness is inadmissible." U.S.C.A. 14 §2425 LaFrance v. Bohlinger, D.C. Mass.1973, 365 F. Supp. 198

Petitioner contends that due to the use of extremely powerful pain medication during and following Ms. Rueb's procedure, and the presence thereof during questioning by law enforcement officers, that Ms. Rueb's statement could not be the product of rational intellect and is therefore inadmissible.

In Ms. Rueb's statement, however, she told officers that the intimate acts which resulted in her injury were consensual and made references to pleasure from them.

Zoeller later confronted Petitioner, Micah L. Yarborough, after Petitioner had tried contacting him twice, leaving messages. Petitioner agreed he would cooperate in any way helpful. Zoeller and Petitioner proceeded to the Police Station in Zoeller's car, where Petitioner waived his Miranda Rights.

Once confronted by Zoeller in interrogation, which took place in part in the interrogation room, another in his car, and yet another in the conference area, Petitioner told him that he and alleged victim were involved in the intimate act of fisting. Petitioner stated that her injury was accidental with no malice present. After repeating this several times, Zoeller became very agitated and began to use his authority, size, and temper to cause the will of the Petitioner to be overborne.

> "Questioning tactics such as raised voice, deception, or a sympathetic attitude on part of interrogator will not render confession involuntary unless the overall impact of the interrogation caused defendant's will to be overborne." C.A.8 (Ark.) 1998. U.S. v. Ingle, 157 F.3d 1147

He first stated that Ms. Rueb told him in her statement that she believed the accident to be intentional when in fact she hadn't, even after Zoeller told her that I said it was intentional. At the time of Zoeller and Ms. Rueb's meeting, I had yet to be approached by Zoeller or any other Sheriff employee. He lied to Ms. Rueb in an attempt to make her incriminate Petitioner. Zoeller then stated that he had spoken with Petitioner's parents and they believed him to be "Guilty as Hell." He then promised leniency in the form of probation if Petitioner would confess. Zoeller told Petitioner if he did not, he would be

7

charged with Attempted Murder and "spend the rest of his life in jail." All of these things were said with extreme anger, and Petitioner believed at several points that he was in danger of physical assault.

After hours of a torturous mental assault Petitioner gave Zoeller a false statement. Zoeller asked on several occasions if Petitioner was just telling him this or if it was true. Petitioner replied he just wanted the abuse directed toward him to end.

> "Confession obtained by police through use of threats is violative of this clause."
> U.S.C.A. 14 §2437 Haynes v. State of Wash., Wash 1963, 83 S.Ct 1336, 373 U.S. 503, 10
> L.Ed.2d 513. See also Lynumm v. State of Ill., Ill 1963, 83 S.Ct. 917, 372 U.S. 528, 9 L.Ed.2d
> 922; Townshend v. Henderson, C.A.Tenn. 1968, 405 F.2d 324; Barnes v. State 1950, 229S.W.2d
> 484, 217 Ark. 244.

> "The assault and torture of a person by state and county officials not in their personal pursuit but
> under color of official authority solely for the purpose of compelling the person to confess the
> commission of a crime constitutes a deprivation of rights, privileges, and immunities guaranteed
> by this clause." U.S.C.A. §840 Apodaca v. U.S.,C.A.N.M.1951, 188 F.2d 932.

At the end of questioning, Zoeller asked Petitioner if he felt he had been coerced or intimidated in any way. Petitioner replied, "Yes." Zoeller became infuriated and began to scold Petitioner until he finally gave in and answered "No."

> "Use of police coercion to extract involuntary statement is violation of due process under this
> amendment, and to extent that such use of police coercion is regarded as violation of right against
> self-incrimination, made applicable to the states, an independent line of precedents under Amend.
> 5 also requires exclusion."
> U.S.C.A. 14 §2422 U.S. ex rel. Hudson v. Cannon, C.A.ILL.1976, 529 F.2d 890.

> "Evidence coerced from a witness is inadmissible." U.S.C.A. 14 §2425 LaFrance v. Bohlinger,
> D.C. Mass.1973, 365 F. Supp. 198

No food or rest as offered to Petitioner at any point during the interrogation and Petitioner had attained no rest since the injury occurred due to worry. This gave Detective Zoeller a clear advantage over Petitioner and easy means to cause his will to be overborne.

> "Among factors relevant to inquiry into voluntariness of confession are nature and duration of
> questioning used to secure confession, whether defendant was prevented from eating or sleeping,
> and whether defendant was under influence of drugs or alcohol." C.A. 7(ILL.) 1997. & U.S.C.A.
> Const. Amend. 14 Watson v. Detella, 122 F.3d 450.

> "Despite valid waiver of Miranda rights, prolonged interrogation might render eventual confession
> involuntary." C.A.D.C.1988. U.S.C.A. Amends 5,6. U.S. v. Yunis, 859 F.2d 953 273 U.S. App
> D.C. 290.

Petitioner was taken into custody following the interrogation and booked into the McLean County Jail.

At Pretrial, Petitioner requested a reduction of bond, which was granted. Petitioner awaited bond for 89 days, during which time Ms. Rueb came to visit him stating that she

8

knew her injury was an accident and she would bond him out as soon as she could. Ms. Rueb bonded Petitioner out of Jail.

Ms. Rueb went beyond this by securing a marriage license for herself and Petitioner from McLean County, which was signed in witness.

Ms. Rueb filed an affidavit with Petitioner's Public defender requesting that the Court's Order of protection be dropped. Motion was denied.

On July 14, 2004, before the start of Petitioner's trial, Detective Zoeller approached him in the waiting room of the Court and proceeded to interrogate and intimidate him again. Trial was continued to September 14, 2004.

Days before trial, Petitioner spoke with his attorney who suggested he plead guilty. She stated that if he did not he would be convicted and would receive seven years. Petitioner took this advice and pled guilty, yet publicly maintained his innocence.

Petitioner pled guilty on September 14, 2004 for the offense of aggravated domestic battery, which would be heard for sentencing on November 22, 2004. A trial of character was to be held, as there was a partially negotiated agreement.

> "Guilty plea by state prisoner seeking habeus corpus relief did not forclose consideration of question of voluntariness of incriminating statements and confession prior to and during preliminary hearing in view of claim that the statements and confession placed duress upon prisoner to enter guilty plea." U.S.C.A. Const. Amend. 14 §2442 Sessions v. Wilson, C.A.Cal.1966, 372 F.2d 366.

On November 22, 2004, Petitioner presented letters of character to the Trial Judge, and presented testimony from family and his fiancé' which spoke of only the highest values, skills and achievements. It appeared during the Trial that none of these were considered.

Great consideration was given however, to the statement of allocution given by Ms. Rueb, which had been written that morning in the presence of the Assistant State's Attorney, Jane Foster, and contained many instances of perjury.

Expert testimony was given by the operating doctor at which time he stated that childbirth does not weaken the vaginal walls, in fact in strengthens them. However, it has been proven that not only childbirth, but age alone and the use of some medication can cause perforations in the vaginal walls weakening them and making them less elastic. After this second display of perjury, the doctor stepped down from the witness stand and gave the Assistant State's Attorney a thumbs up, arousing suspicion from those present of conspiracy.

> "'Perjury' requires willful intent to provide false testimony, rather than confusion, mistake, or faulty memory." C.A.7 (ILL.) 1998. 18 U.S.C.A. §1623 – U.S. v. Fowley, 137 F.3d 458. – Perj 3.

Ms. Rueb's statement at sentencing was entered after a phone conversation with Petitioner's mother, Mandy Grissom, where she swore to say anything to get Petitioner

9

sent to prison, even if she had to lie. She held the same conversation with Petitioner's step-mother, Brandy Yarborough.

False evidence was entered at sentencing as well. Songs that had been written while Petitioner was in custody at the McLean County Jail were presented to the Court with accusation that the Petitioner had mailed them as a threat. The mailing envelope was also entered. Petitioner did mail at Ms. Rueb's request a package containing her prescriptions, her children's prescriptions and 600 dollars cash in a bank envelope. Nothing else was included in the package. The songs that were entered were in fact the writings of Petitioner, but were in Ms. Rueb's custody from the time Petitioner made bond, to present. Ms. Rueb also still has in her possession all of Petitioner's personal property such as furniture, clothing, books, paperwork, and articles from his childhood.

This show of perjury is due to, from the mouth of Ms. Rueb, Petitioner ending their relationship, which resulted from her obsession and use of drugs and alcohol, which led to her eventual overdose. Before sentencing Ms. Rueb's children were taken into custody by Susan Myer of DCFS.

Despite all of these facts, which counsel failed in large part to address, cross-examine, or make objections to, Petitioner was sentenced to 4-1/2 years in the Illinois Department of Corrections.

Petitioner submits that the actions of the authorities violated the federal constitutional guarantee of Equal Protection of the Laws. The statements attained through severe verbal abuse, coercion, intimidation and threats made it impossible for Petitioner to believe he had any rights whatsoever. Authorities therefore directly prejudiced Petitioner. The state should be ordered to release Petitioner unless a new trial is held, at which time such inadmissible statements obtained through direct violation of constitutional rights be excluded.

> "State prisoner detained in violation of this amendment because of admission of confession which had been extracted by coercion, was entitled to be freed, but the state must be allowed reasonable time in which to retry him." U.S.C.A. §2457 Reck v. Pate, ILL. 1961, 81 S.Ct. 1541, 367 U.S.433, 6 L.Ed.2d 948.

Petitioner further submits that the perjury present and unchallenged from highly critical testimony denied him a fair trial. It cannot be denied that when the Judge imposed sentence, the decision was based in large part on the statements and testimony given by Ms. Rueb and the State's expert witness, which were both perjured.

The State's Attorney addressed Ms. Rueb's instability several times to Petitioner's public defender outside of the courtroom, and her overdose and near death as a result, was common knowledge, yet the State allowed false testimony.

Petitioner's attorney failed to thoroughly cross-examine witnesses and make objections to the malicious perjury committed by state witnesses. A criminal defendant is entitled to the effective assistance of counsel at trial. If the attorney makes a serious mistake, which

10

could affect the verdict, reversal is required, even if the attorney was generally competent.

Petitioner did not continue to jury trial because his attorney stated that he would be convicted and WOULD receive seven years. Petitioner submits that it is ineffective assistance of counsel for an attorney to presume that conviction will beyond a doubt occur and maximum penalty will be given, without first making proper motions of suppression and challenging false testimony and statements. These motions and objections have long been recognized under Illinois Law, however they were not made. Any attorney with ordinary competence in criminal law would take such actions to ensure that the rights of justice, and the Petitioner, will have been served. Failure to do so constituted ineffective assistance of counsel.

"A defendant has the right to effective assistance of counsel" U.S.C.A. 6

This Court should direct that an evidentiary hearing be held on the issues herein and/or grant habeus corpus relief on the grounds that federal constitutional rights have been violated and ineffective assistance of counsel has been shown.

In federal habeus corpus jurisprudence, violations of rights, which go to the central issues of guilt or innocence, have a preferred position and are deemed the most deserving of habeus corpus relief.

11

## **Relief Requested**

Wherefore, Petitioner Micah L. Yarborough moves this Honorable Court to grant the
following relief:

a. Accept jurisdiction over this case pursuant to 28 U.S.C. §2254;
b. Require the Respondent to answer the allegations in this Petition and Brief in
   Support;
c. Hold such Evidentiary Hearings as this Court may deem necessary or appropriate;
d. Issue an Order that this Court will grant a Writ of Habeus Corpus unless a new
   trial is held within a certain amount of time, excluding the inadmissible evidence
   laid out in this Brief in Support;
e. Issue a Writ of Habeus Corpus freeing Petitioner from his unconstitutional
   confinement.

Respectfully submitted,

Micah L. Yarborough - R34632
P.O. Box 500 Route 51
Vandalia, IL 62471

12

 

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
STATE OF ILLINOIS, COUNTY OF McLEAN

**PEOPLE OF THE STATE OF ILLINOIS**
vs.                                                Case No. _04 CF 280_

_Micah Yarborough_
Defendant

## JUDGMENT - SENTENCE TO ILLINOIS DEPARTMENT OF CORRECTIONS

WHEREAS the above-named defendant _5-3-82_ has been adjudged guilty of the offenses enumerated below,
(date of birth)

IT IS THEREFORE ORDERED that the defendant be and hereby is sentenced to confinement in the Illinois Department of Corrections for the term of years and months specified for each offense.

| COUNT | OFFENSE | DATE OF OFFENSE | STATUTORY CITATION | CLASS | SENTENCE |
|-------|---------|-----------------|--------------------|-------|----------|
| I | Aggravated Dom Battery | 3/18/01 | 720 ILCS 5/12-3.3 | 2 | 4 Yrs. 6 Mos. and said sentence |

shall run (concurrent with) (consecutive to) the sentence imposed on:

_____ _____ _____ _____ __ ____ Yrs. ___ Mos. and said sentence

shall run (concurrent with) (consecutive to) the sentence imposed on:

_____ _____ _____ _____ __ ____ Yrs. ___ Mos. and said sentence sha

run (concurrent with) (consecutive to) the sentence imposed on:

_____ _____ _____ _____ __ ____ Yrs. ___ Mos.

IT IS FURTHER ORDERED that the sentence(s) imposed on count(s) _____ be (concurrent with) (consecutive to) the sentence imposed in cas

number _____ in the Circuit Court of _____ County; be (concurrent with) (consecutive to) the sentence imposed in case

number _____ in the Circuit Court of _____ County; be (concurrent with) (consecutive to) the sentence imposed in case

number _____ in the Circuit Court of _____ County.

The Court finds that the defendant is entitled to receive credit for:

☐ Time served on periodic imprisonment for the duration of its term from _____ to _____ for a total of ____ days.

☒ Pre-trial detention credit of _189_ and a credit against fines of $ _445_ ($5/day)

☐ Credit for other time served in custody of _____ days.

The total credit for time served shall be _189_ days.

(Check boxes if applicable)

☐ Convicted of a class ____ offense but sentenced as a class X offender pursuant to 730 ILCS 5/5-5-3(c)(8).

☐ The Court further finds that the conduct leading to conviction for the offenses enumerated in counts _____ resulted in great bodily harm to the victim (730 ILCS 5/3-6-3[a][2][iii]).

FILED
McLEAN NOV 22 2004 COUNTY
CIRCUIT CLERK

IT IS FURTHER ORDERED that Defendant is sentenced to pay a fine of $ _150 DV, 100 B 20SS 25VCVA_ plus costs c

$ _200 DNA 4 ISP + 542 costs_; to pay restitution of $ _____ to _____

_____; all to be paid by _w/i 1 yr from release_. Bond applied.

IT IS FURTHER ORDERED that _____

_____ IT IS FURTHER ORDERED

that the Clerk of the Court deliver a certified copy of this order to the Sheriff.

IT IS FURTHER ORDERED that the Sheriff take the defendant into custody and deliver him to the Department of Corrections which shall confine said defendant until expiration of his sentence or until he is otherwise released by operation of law.

This order is ( _X_ effective immediately) (_____ stayed until _____ ).

DATE: _11/22/04_     ENTER: _____

JUDGI

(PLEASE PRINT JUDGE'S NAME HERE)

'1/16/04

To whoam it may concern.
My name is Errol "Romo" Romero
former Sheriff of Iberia Parish
and presently State Representive for
Iberia Parish. I am writing on
behalf of Micah L. Yarborough
who I hared known all of his
life I saw him grow up and
he was a good child. He
exemplified all the good things
you would expect from a boy.
My wishes are that you take
this into consideration when
dealing with him.
    Thank you very much.
    Errol Romo Romero

**In Reference to Micah L. Yarborough**

It's hard to know what to write when someone holds the next few years of your child's life in their hands.  The hardest thing as a parent (especially a mother I believe) is getting a phone call saying your child is in trouble.  I recall that night like it was just last night.  As I spoke with the officer in charge I knew without a doubt that the charges he was referring to be charge against my son had to be false.  There had to be some huge misunderstanding.  As I said to the officer, had you told me speeding ticket or perhaps an auto accident I might believe it, but not doing bodily harm to someone especially someone he cares about.   I still hold true to that belief today, now more than ever after the many, too numerous to count conversations with not only my son, but the alleged victim.  I am aware that all the evidence will not be presented today.  I am aware that my son took a plea bargain in spite of my firm belief he should not, but felt he had no choice.  That being said I would like to address the court.  Twenty four years ago I was told I was pregnant.  That in itself seemed to be a miracle as I had tried for quite a while.  The pregnancy was a very tough one.  Most of it spent in the hospital.  The birth was not an easy one.  But the joy, the gift from God is more than words could ever express.  I had a son.  I named that son, Micah Lloyd Yarborough.  This child was raised in a Christian home.  He attended Christian school until his latter years.  Was he a perfect child?  No, what child is?  But he was and is my only child.  He excelled in high school to earn the most improved in his senior year.  He is a very talented artist.  He is very intelligent.  Does he always make right decisions, no.  But then again, neither have I.  I do know this; my son has never physically hurt any female he has ever been involved with.  If I thought for one moment he did, I would NOT be standing before the court or writing this letter.  I am asking the court for leniency in this matter.  Micah's grandfather is ill, as I have presented to the court on a previous occasion.  His Step-Grandfather has just been diagnosed with Lung Cancer a month ago.  We are a small family.  I know there will be family issues and losses we will have to deal with soon.  It is my hope that Micah will be able to move back closer to his family.  It is my hope that the judge presiding over this case will understand that this incident was not one done in anger or malice.  It is just what both Micah and the alleged victim said it was.  An accident, freaky as it may be.  I thank you for your time and your consideration.

To whom it may Concern:

I am writing this letter on behalf of my son Micah Yarborough. I wish I could tell you about him in person, because words don't describe the true man he is.

When Micah was five he had to come to terms with his mother and I getting a divorce, this was very difficult on Micah. His mother and I always tried to instill good morals and strong family values in Micah. He was not brought up in a home with drinking or drugs. Micah was given the best schooling possible and attended only private and catholic schools; Micah always maintained a high grade point average.

Micah Knows right from wrong and the only thing that he is guilty of is being to trusting and trying to see the good things in certain people. Micah is not a violent or spiteful man. He would never for any reason go out of his way to hurt or harm anyone.

Micah has a past with trying to give to his community, he was involved in boy scouts as a child; as a youth he was involved in the R.O.T.C and as a adult during the May floods here in Louisiana he worked as a volunteer fire fighter to help rescue the flood victims, this is just a few of the things Micah has done in the past only to help others.

As for Katy, the woman who has testified against Micah, I am completely disappointed in the fact that a full mental evaluation was not done on her. Giving what I personally know about her, and the confession she told my wife about her false pregnancy. When she was asked why she did this, her answer was so she could keep Micah with her. Katy also made a statement to my wife on the phone, she stated that if she couldn't be with Micah no other woman would be with him either and she would make sure of that, she said she would do and say anything to accomplish this.

Looking from this situation from an outside point of view, it appears that if the court system would investigate Katy and her past background like they have done to Micah, they would see truly who they are dealing with and that they have the wrong person in jail.

Thank You,
Lloyd Yarborough

Jaime Cagley
1617 Iowa Street
Bloomington IL. 61701
(309)828-9854
gumbyr@yahoo.com

To Whom It May Concern,

My name is Jaime Cagley and I have been intimately involved with Micah Yarborough
for six months. I am a full time student and a full time working mother. My daughter is
almost five years old. When Micah and I began to see each other, he accepted my
daughter and me with open arms even with all that came with us. I have never to this day
met anyone so responsible. He has done everything for us. He worked very hard to
contribute to our family. He is very intellectual and has and always will maintain to go
above and beyond for his family. He gave my daughter a father and she has never been
so happy. He has never hurt either one of us in any way. He is a loving father and
companion. Even behind bars, he has maintained constant communication and love for
us. With all that we have been through, I know that Micah could never intentionally hurt
anyone. It saddens me to think that someone could be put behind bars that is so vital out
in the community. I urge you to give Micah a chance to prove to you what we already
know. He is a good contributor to our society, please let him show you what he is
capable of. Thank you for your time and consideration in this matter. If I can be of any
other assistance, please feel free to contact me.

Sincerely,

Jaime Cagley

# JOHN W. YODER LAW FIRM

ATTORNEYS AT LAW
306 EAST GROVE STREET
P. O. BOX 730
BLOOMINGTON, ILLINOIS 61702-0730

JOHN W. YODER
JOHN WM. YODER
LEEANN S. HILL

TELEPHONE
(309)829-3344
FAX
(309)828-4496

January 10, 2005

To Whom it May Concern:

I am writing in reference to Micah Yarborough. I represented Micah in the case he is currently incarcerated for. During my time as Micah's attorney I came to know an extremely bright and capable young man. Throughout the difficult time of his being charged and his pleading guilty to this case, Micah cooperated in every manner with all advice he was given by me. He could have had a trial in this case, but Micah made the difficult decision to plead guilty and not put the victim, her family and his family through the burden and pain of a trial and reliving the experience. I believe despite the setbacks that Micah has had, he will overcome all the obstacles that will be placed in front of him in the future, and he will rehabilitate himself into a good and productive citizen. He has a great support base in his family and his own dedication to education and hard work will make him a better person in the future. I look forward to knowing him then.

If I can answer any further questions, please feel free to contact me at the above telephone number.

Sincerely,

Lee Ann S. Hill

# Crystal Thielen-Harris

111 Live Oak
Livingston, Tx. 77351
Phone: (936)967-5353 Home
(936)328-3984 Cell
Email: crystalct@livingston.net

November 17, 2004  Re:    **The character of Micah L. Yarborough**

To Whom It May Concern,

Micah and I were in a relationship for two yrs in 1998-1999 and lived together for most of it.  During the relationship we had a son, Brenden Joseph Yarborough, on March 9th of 1999.  Throughout our relationship Micah was never abusive to me, our son, or to anyone else.  I moved to Livingston in July of 1999 and the distance between us solely caused a termination of the relationship. He always treated people with respect, worked hard at what he was doing, and tried to provide what anyone around him needed.  I am currently in shock over this situation because being violent in anyway is not like Micah.  We did have arguments in the relationship and within the past five years but they never involved anything of physical or emotional abuse on his part.  I have faith in Micah and believe these allegations to be false due to his loving nature and his knowledge of right and wrong.  I have included all of my contact information at the top of this letter and welcome you to contact me for any reason.  Thank you for your time.

Sincerely,

*Crystal Thielen-Harris*

Crystal Thielen-Harris

# Micah Yarborough
1617 Iowa, Bloomington, IL 61701
309-242-2232

## Experience

Pyxis Technology & Consulting            Bloomington/IL
**Owner/Tecnician**
Contracted by Radisson Hotel & Conference Center

- Coded event display in HTML, ASP and Javascript
- Built PC with television capabilities
- Configured IIS to allow for Internet posting capabilities

TekSystems                               Bloomington/IL
**PC Deployment/Technician**

(Participated in Northwestern Mutual Windows XP Upgrade Deployment for the central IL area)

Responsibilities included:

- Successful backup of the end-user data using and internal tool called Desktop DNA.
- Successful Win XP base re-image of the workstation via CD or server load.
- Successful restoration of the end-user data using Desktop DNA.
- Reinstallation of identified software applications in addition to the base image and validation of proper operation.
- Completion and validation of network connectivity.
- Re-map all end user printer connections and validation of print capabilities.
- Installation of all third party applications.
- Review process with end-user to ensure the deployment was correctly completed.
- Train end-user on proper use and navigation of new OS.

O'Brien Automotive Group                 Peoria/IL
**Director of IT**

- Stabilized the network
- Negotiated contracts with vendors
- Reynolds & Reynolds Administration
- Implemented new standards organization wide
- Developed organization wide inventory tracking
- Responsible for building new workstations
- Worked with Heart Technologies on Security - Visual and Cabling
- Designed network topology map
- Designed network plans for the future implementation
- Took all IT related calls from 8 dealerships across Central Illinois and provided support

Heartland Community College              Normal/IL
**ITS Technician**

- Project management - involved with dealing directly with clients and vendors
- Software research and deployment
- Providing quick response to calls and tickets to meet SLA
- Providing excellent customer service
- Cabling drops for phone and network
- Responsible for maintaining a clean and safe repair center
- Various other duties
- Handling escalated problems

**State Farm – Corporate**          Bloomington/IL
**Security Analyst III**

- FileNET / Hp3000 MPE\iX Security
- Guidance and Standards Documentation
- Handling of escalated problems and issues within my functions areas

**Enron**          Houston/TX
**Sr. Security/Systems Administrator**

- Provided excellent customer service to business partners\clients
- Developed and implemented security standards and guidance documentation to provide efficient, effective security models throughout the organization
- Developed Lotus knowledgebase for security sector using Web and other internal resources
- Recruited, hired and oversaw training of security professionals
- Conducted employee performance reviews and evaluations
- Devised and implemented staff development plans
- Advised senior management on networked product service issues
- Consulted to internal groups within company on various issues from network to web\app development
- Provide third-line support for PC networking, hardware, and software
- Provided management and support for FileNET Imaging systems and optical libraries

**Halliburton (Contract)**          Houston/TX
**Securtiy Analyst III**

- Responsible for FileNET security
- NT security
- IBM 3090 Mainframe ACF2, Tables (RMDS)
- Citrix Metaframe - provided security for in the absence of Citrix admin
- Peoplesoft Security
- Server Development
- Responsible for the documentation of all security procedures and standards
- Windows 2000 Pro, Server, Advanced Server

**Karate Kids**          Deer Park/TX
**IT Specialist/Admin**

- Created company website (CSS\HTML\JavaScript\Java\ASP)
- Managed a network team responsible for providing steady, efficient workflow
- Directed day-to-day activities of network and technician staff
- Managed staff performance reviews, salary adjustments and recruiting
- Monitored all purchasing, and quality of network services hardware
- Managed complex projects and programs
- Performed pre-purchase activities including presenting capabilities, fact-finding, and pre-purchase discussions

**Microdyne Computers**          Deer Park/TX
**Owner**

- Developed web sites (html\JavaScript\flash\java)
- Remote administration while in transit
- Hardware sales and custom builds
- Consulting
- Responsible for maintaining 24 hr. technical support to customers
- Supervised and managed team of 6 technicians/CSR employees

## Education

- 6/1998         Deer Park High School       US-TX-Deer Park
  High School Diploma

- 6/1998         San Jacinto College        US-TX-Pasadena
  Co-Op

- 12/2002       Heartland Community College     US-IL-Normal
  Credit Hours Toward Bachelors

## Skills

- Cisco CCNA Certified
- Microsoft
- VB
- FileNet Imaging
- MS Office
- ASP
- Linux
- Security
- Network
- Unix/Solaris
- Management
- Design – CAD – Architecture - Portfolio Available
- 3D Design
- Reynolds & Reynolds Automotive Sales and Accounting Software

**Current Career Level**

- Management

**Total Experience**

- 7+ Years

- Authorized to work in US: Citizen
- No Security Clearance

**Ideal Position**

- Network or management position within an organization that believes in cutting edge technology and customer service

**Cad/3D Design Projects**

Russel Francois Architects & Associates       309-828-4055

> **Children's Discovery Museum** – 3d Model created from 2d drawing and foam-board physical model built for presentation.

> **Wesley United Methodist Church** – 2D to 3D conversion. Models built in 3d Studio Max and added to photos and textured in Photoshop. East Renovation, West Renovation, and Interior Renovation

> **Ensenberger's Renovation** – Add-on extruded in Autocad and exported to 3d Studio Max. Model was trimmed and scaled and added to photo of building in photoshop. Picture was then textured and fit, color corrected, and perspective was refined.





Home    Media Update    L.E.O.P.
Contact    What Is S/M?    News

## RESOURCES

❑ HELP! Incident Response

❑ Calendar

❑ Document Library

❑ What We're Doing

## OPPORTUNITIES

❑ Donations

❑ Membership

❑ Volunteer Opportunities

## SUPPORTING MEMBERS

❑ Coalition Partners

❑ Member Groups

## CONTACT US

❑ Staff Directory

# "SM Issues for Healthcare Providers"
## by Susan Wright and Dr. Ruth W.

**Presented at the Gay and Lesbian Medical Association
17th Annual Symposium
in San Diego, California on Aug 27, 1999**

I. Who we are... why we are doing this

Introductions of Dr. Ruth W., neurologist, and Susan
Wright, Policy Director of NCSF

We are presenting on "SM Issues for Healthcare
Providers" because the same issues which may lead to
inadequate health care for patients with non-mainstream
sexual orientations or gender identity affect those who
participate in sexual minority practices.

There are many questions related to physical or
psychological health which patients may feel unable to
ask because of fear of discrimination or of breach of
confidentiality. As health care providers, we have a
responsibility to be able to address these concerns
without passing judgment.

An understanding of the basic principles of SM play
enables us to fulfill this responsibility. In addition it is
important that we be able to identify when someone is in
an abusive non-consensual situation and to provide them
with appropriate support. This workshop will address the
physical and psychological aspects of SM practices and
provide an understanding of common scenarios.

II. Examples of questions Doctors may get

A 50 y/o man defers consulting his family physician about
lower abdominal cramping associated with bowel
movements because he is afraid the doctor will be able to
tell he is into anal sex play and enemas, and that this may
be related to his problem.

A 30 y/o woman gets a vaginal tear from fisting, which is continuing to bleed, but doesn't want to consult her doctor or go to the ER.

A 45 y/o man is left in bondage by a professional dominatrix for too long and develops numbness and weakness of both arms which does not resolve after a couple of days.

A 25 y/o woman newly diagnosed with MS is scared to explore her new interest in SM with her girlfriend, because she doesn't know how to ask her neurologist about what might be safe or dangerous for her to do.

The same issues which may lead to inadequate healthcare for patients with non-mainstream sexual orientation or gender identity affect those who participate in sexual minority practices. This includes gays, lesbians, bisexuals, folks who enjoy SM, who have body modifications such as piercings, tattoos, who crossdress, who are sex workers, who have multiple partners, who are transgendered or engage in fetish behavior.

There are many questions related to physical or psychological health which patients may feel unable to ask because fear of discrimination or of breach of confidentiality. Simple problems fester or become chronic. Patients are afraid to tell their doctors about their alternative sexual expression - even doctors they know are kink-friendly.

We are all unused to discussing sexuality in a neutral atmosphere and we are not given training to do it. In the LGBT community we are at an advantage, because sexuality is often more to the forefront than in the heterosexual community, but this certainly doesn't make us immune to being judgmental about practices outside our realm of experience. But precisely because of this reason I would argue that we have more of a responsibility to address issues related to alternative sexual practices.

Everyone deserves adequate health care, whether they are kinky or straight. As a prerequisite to good health care, the patient must trust their physician.

As healthcare providers we have a responsibility to be able to address these concerns without passing judgment. An understanding of the basic principles of SM play

enables us fulfill this responsibility. In addition it is important that we be able to identify when someone is in an abusive situation and to provide them with appropriate support.

III. What is SM?

SM includes a broad and complex group of behaviors between consenting adults that involves the consensual exchange of power. This includes the giving and receiving of intense erotic sensation and/or mental discipline and power games.

SM activity is often called "playing" or having a "scene" because that is the way the SM-Leather-Fetish community approaches our form of sexual expression. Our equipment is often referred to as "toys". Like any other kind of game, we have rules we play by.

Individuals negotiate their limits prior to having a scene. Negotiation is ongoing; before, during and after the scene (what's known as "aftercare") to make sure the bottom is fine with what occurred. In our community, it's considered polite to check in with a bottom the day after the scene (or to request that they call you). This is usually more for the psychological issues that may have arisen rather than physical concerns.

SM does not feel like what it looks like. SM rests on a firm foundation of ongoing communication because most of what's going on is in the participants head. I'll use the term top and bottom, but it's also called dominant and submissive, or master and slave. SM is sometimes called D/S or BDSM or the practitioner may not identify or label their activities at all.

Contrary to popular stereotypes, the bottom is in control of the scene and can stop the activity at any time. Often people use a predetermined "safeword". This is a word or gesture that will stop the scene. At community events, the established safeword is "safeword," but individuals often have their own personal safeword, or some simply use "no" to mean "no." Sometimes people who are very submissive have trouble saying no, so a word like "red" is easy for them to say. Or some bottoms like to resist and say no, when they really mean yes, so they choose to have a safeword.

This community-wide standard was codified more than ten years ago in the creed: "safe, sane, consensual."

1. Safe is being knowledgeable about the techniques and safety concerns involved in what you are doing, and acting in accordance with that knowledge.

This includes protection against HIV, STDs, and hepatitis. It also includes notifying your partner of any physical condition that may impact on the scene, like asthma, bad back, epilepsy, etc. It also includes psychological safety, such as you were abused as a child and don't like a particular part of your body touched.

The community concerns itself with safety issues by supporting hundreds of educational and social organizations that teach people the proper way to use their equipment. Such as: how to tie wrists without putting pressure on the insides; how to properly clean equipment; which areas on the body are unsafe to stimulate, such as the face, joints, spine, bottoms of the feet.

2. Sane is knowing the difference between fantasy and reality, and acting in accordance with that knowledge.

Since physical acts has so much power, there are many fantasies that can be acted out by only hinting at the physical conditions someone fantasizes about. That's why our language is so symbolic: dungeon, slave, words of humiliation, or affectionate ownership. You may have to break through the fantasy to make sure your patient likes and wants what is happening.

Sane includes being of clear mind, and the community strongly recommends that mind-altering substances should be avoided during a scene, including alcohol, illegal drugs, and prescription drugs that impair judgment.

3. Consensual is respecting the limits imposed by each participant at all times. One of the recognized ways to maintain limits is through the "safeword" I mentioned. If it's nonconsensual, then it's abuse or assault. SM must be consensual.

To determine if informed consent has been reached, you can ask the following questions:
a) Was informed consent expressly denied or withdrawn? (similar to rape standards, if one of the participants

withdraws consent during the activity, that must be respected)
b) Were there factors that negated the informed consent? (alcohol impairment, drug use, underage participants)
c) What is the relationship of the participants? (first encounter or long-term partner?)
d) What was the nature of the activity? (did it cause permanent harm, was it unsafe, was it enjoyable?)
e) What was the intent of the accused abuser? (to cause pleasure, to gain dominance, to gain control, to hurt?)

IV. SM vs Abuse

The community standard of safe, sane and consensual emerged from the growing national concern with domestic violence. SM is not domestic violence, but increasingly as SM gains wider mainstream acceptance, there are abusers who take advantage of men and women who enjoy SM. This makes it difficult for you, as a doctor who is required to report abuse.

If there are physical signs, you can usually judge by the marks.
1. SM rarely results in facial marks or marks that are received on the forearms (defensive marks).
2. There is usually an even pattern of marks if it is SM, indicating the bottom held quite still during the stimulation.
3. The marks are often quite well defined when inflicted by a toy like cane or whip, whereas in abuse there are blotches of soft tissue bruising, randomly distributed.
4. The common areas for SM stimulation is on the buttocks, thighs, back, breasts, or the genitals. The fleshy parts of the body can be stimulated intensely and pleasurably.

Questions to ask to determine if it is abuse. Whether an individual's role is top/dominant or bottom/submissive, they could be suffering abuse if they answer no to any of the following questions:

1. Are your needs and limits respected?
2. Is your relationship built on honesty, trust, and respect?
3. Are you able to express feelings of guilt or jealousy or unhappiness?
4. Can you function in everyday life?
5. Can you refuse to do illegal activities?
6. Can you insist on safe sex practices?

7. Can you choose to interact freely with others outside of your relationship?

8. Can you leave the situation without fearing that you will be harmed, or fearing the other participant(s) will harm themselves?

9. Can you choose to exercise self-determination with money, employment, and life decisions?

10. Do you feel free to discuss your practices and feelings with anyone you choose?

V. Intersections of SM and Healthcare

The role of Health Care Providers is to educate the patient to understand the medical problem. Give the patient the info to help determine what is safe, and what to do if there is a problem. If they don't know already, they should know to educate play partner(s).

1. When SM causes health problem (least common). An accurate report of activity is essential and requires trust from patient:
a) Fainting or dizziness
b) Bondage-related - causing nerve damage, joint strain, numbness
c) problems releasing retained rectal objects

2. When the patient wants advice on what is safe (pretty common). Much of this we can figure out from common medical knowledge (eg how long can vascular supply be cut off), but you may need expert advice on this from scene-friendly physicians:

a) extreme bondage (breast, genital)
b) play-piercing
c) breath control
d) anal play
e) nipple piercing and breast-feeding

3. When health problem inhibits a patient from full expression of sexuality. This is more straightforward, and involves educating patient about their disease:

a) MS: fatigue, overheating, numbness, coordination, sexual dysfunction,
b) CAD: HTN level of exertion,
c) Diabetes: avoiding hypoglycemia,
d) Asthma: need quick-release restraints, no chest or breath restraint,

e) Epilepsy: awareness of aura, what to do if seizure occurs,

f) LBP, arthritis: avoid putting strain upon joints (shouldn't do this anyway).

VI. Talking to your Patients about SM

1. Who is involved in SM?

You have patients involved in SM practice and you don't know it. One out of every ten Americans engages in diverse sexual behavior, yet the stigma against these millions of people means that these people aren't talking about their sexuality as it impacts on their health concerns.

How does a patient come out about SM activities to a healthcare provider? It may be that the provider simply notices piercings or marks or shaved skin. Don't ignore these signs—ask questions to ensure it is consensual SM. That will encourage your patient in turn to ask their health care questions. As you ask questions, never assume you know the kinky activity by a person's appearance.

As an added bonus, Doctors can benefit from being kink-aware because the SM community constantly talks to each other. They belong to support groups, women's groups, special interest groups, and word gets around. You could find you're getting many referrals if it's known that you don't pass judgment on their lifestyle.

2. Don't discriminate against SM practitioners.

It is imperative for you to be nonjudgmental. As a prerequisite to good health care, the patient must trust their physician. To create that trust, the HCP must be receptive. Patients are often inhibited from going to HCP in the first place because of embarrassment/fear of being judged or discriminated against. Many practitioners don't even tell their therapists much less their doctors.

You must be aware that there is REAL discrimination and persecution going on against SM practitioners. The analysis of the NCSF Violence and Discrimination Survey indicates that 1/3 of the respondents have suffered discrimination because of their SM practice, and another 1/3 have suffered attacks and harassment because of their SM practice. People lose their kids, their jobs, their

spouses, and even suffer estrangement from family members because of the stigma. NCSF has received complaints from people who have been lectured by their doctors to stop what they are doing, or they were made to feel like they were wrong.

Just because you treat and understand a kinky patient, that's not the end of the road. Often you have to make referrals, and you will have to educate other HCP. This includes making them comfortable enough and knowledgeable enough to give quality medical care to the patient.

3. How do you talk about SM with your patient?

You as the Health Care Provider may be embarrassed about expression of sexuality in patient. Most of us are uncomfortable with discussing sexuality. Medical school doesn't address this issue, and our society is taught to treat sexuality as a joke or something to be avoided.

4 out of 5 of the people who participate in the organized SM community are closeted at work or with their friends and family. Some don't even tell their primary partner about the SM activities they engage in. This can cause problems for the doctor when the patient hems and haws and doesn't ask their real question until your hand is on the door knob. It can take up extra time you don't have. So be sensitive to hints and tentative probes - it may be up to you to help them discuss their activities and how it might be adversely affecting their health.

Remember that your patients have had no experience talking about this in the way that you require. They may provide too much information about their personal desires and explain their sexual encounters in ways that are embarrassing to you. They aren't trying to shock you - they are simply sharing in the way they've learned through SM support and educational groups. You can gently help them stay on track by asking questions and keeping the dialogue moving.

VII. Conclusion

We are here because we want to be able to address these needs of our patients, as they can have deep impact upon level of healthcare sought and given. Patients have a right to this. If we don't feel comfortable we should refer to

someone else, and not at patient's emotional expense. As LGBT Health Care Providers, I feel we are better equipped to deal with these issues because our sexuality is a more prominent factor in our identity, and we should have more empathy for those who feel marginalized because of sexual practices.

We don't have all the info about what the patients' needs are, and they may not tell, or even anticipate all of their activities, and they don't have the medical information to make decisions about safety.

How we can appear non-judgmental:

a) Ask about sexual partners/activities when taking medical history
b) Be very careful about judgmental language and use open ended questions.
c) Ask patient to define terms used rather than making assumptions.


VIII. Open up for questions

**Home / Contact Us / Webmaster**
*The National Coalition for Sexual Freedom*
*1312 18th Street NW, Suite 102*
*Washington, DC 20036*
*email: ncsfreedom@ncsfreedom.org*
*General Information Line: 202-955-1023*
*Media Hotline: 202-955-1029*
*Fax: 202-955-1060*



February 2000

**coverstory**
**Pursuing the Femme Identity**
by Andrea Spoehrer

**features**
**Revealing the "psuedo-invert"**
**Una, Lady Troubridge**
by Alison Phipps
**Ashes in the Paint**
by Michelle Bancroft

**columns**
**Health**
by Dr. Lipstick
**Wealth**
by Ms. Moneygrrl
**Sex**
by SexySuzi
**Advice**
by Victoria
**Fashion**
by Dara
**Femme Perspective**
by Kenya
**Butch Perspective**
by D

**Publisher's Note**
**Letter from the Editor**
**Contribute to Femme**



Send questions to Dr Lipstick at
**lipstick@stonefemme.com**

## Dear Dr. Lipstick

**D**ear Dr. Lipstick:

**I** love fisting ....I mean I LOVE fisting... but I do have some concerns about it... like is it dangerous? Are there things I should avoid? Please say it ain't so cause I am....

**F**ulfilled in Fresno

**D**ear Fulfilled:

**Y**es, fisting can be wonderful (I'll let Sexy Suzi expound on that)...and for the most part it is safe, but there are things to be careful about in the process. The most critical issue is injury. Injuries can range from a fingernail scratch and minor tissue tears to excessive bleeding and perforation. Now, I would be the last person to try to dissuade you from fisting but let's look at each one of these problems and the ways to avoid them. A word of warning though...I need to talk anatomy here so it might be a bit clinical.

**S**cratches can be prevented quite easily...cut the offending nails or tape cotton balls to the ends of said fingers and wear a latex glove or two. Even minor cuts can expose you or your partner to bloodborne pathogens (organisms that live in the blood), like hepatitis B and HIV...but I'll be addressing that below. Minor tissue tears can result from rushing into things, so to speak. The skin around the vaginal opening, the labia (vaginal lips) or even the urethral opening (where you urinate from) can get torn if the vaginal muscles are not relaxed enough, the fist is too large, or if you don't use enough lube....lube is the most important part of fisting, I think...there can never be too much!

**E**xcessive bleeding can result from major tears, perforation of the vaginal wall and excessive pressure against the cervix (which sits at the top of the vagina) and uterus. These injuries can occur when the action gets outta control, which makes it so important to stay in communication with your

partner. Of course relaxation and lube are critical here as well. The intense contractions of orgasm might also start menstrual periods.

Speaking of periods, fistees who are perimenopausal (around the time of menopause) or past menopause experience a drop in estrogen. This may result in decreased vaginal secretions and a thinning of the vaginal tissues. This in turn can increase the chance of tears. So for women in this stage of life, lube is very helpful...and being gentle is really important. Taking estrogen supplements or using estrogen vaginal cream may also help, but be sure to discuss this with your gynecologist first. She can help you decide if this is a wise choice for you, in light of your symptoms and medical history.

Major tears or perforation, and the possibility of hemorrhage, are very serious threats to your health and should receive immediate medical attention. This is no time to be shy or embarrassed. See someone immediately if you are experiencing an unusual amount of bleeding, minor bleeding that continues beyond a day, or intense or constant pain.

I must inject here that fisting should not be undertaken when under the influence of drugs or alcohol. As the fistee you must be aware of what is going on in your body and you do not want to "dull" the pain...if something is causing you an excessive amount of pain you want to be aware of it and stop or at least back up and slow down. As the fister, you also want to be mentally present and aware of how your partner is feeling.

Certain conditions warrant medical advice before embarking on this journey, like previous infections and conditions that cause scarring in the abdominal area, intestinal tract, vagina or urethra. These conditions can cause pain and decreased elasticity of the vagina and surrounding organs. The vaginal walls can also be weakened, making them more susceptible to perforation, as a result of giving birth and aging.

So, if you have, or think you might have, a condition that could present problems...please talk to your health care provider before entering into any fisting play. In general, if a physical exam doesn't bring to light any major health conditions, have fun....stock up on lube, go slowly, and be sure to stay in tune and in touch with each other.

One last tip, be sure to empty your bladder after sex (fisting or otherwise) to prevent urinary tract infections...it washes out the urethra which may become contaminated with bacteria from skin or 'bodily secretions' during sex.

**San Francisco**

**INFORMATION**

*Free. Anonymous. Nonjudgmental*

Sex info:  **Call us**              **Email us**        **Weekly co**
           **Frequent questions**    **Websites**        **Books**
                              [ **Search** ]       **View in Sp**
SFSI info:  **Home**                **About us**        **Volunteer**
           **Classes**              **Support us**      **Books fror**

## What does _____ mean?

We get questions from people asking what certain sex terms mean, so here are the most frequently asked words to our **phone switchboard**. Some of them are words that adults find in "personal ads". Some of them are words that children hear at school. Some of them are words that people have heard of but don't know what they mean.

We do NOT claim to list all sex terms here! There are literally tens of thousands of sex-related words English in usage. These are just the SFSI staff are asked to define most often.

**BDSM.** A broad category of types of sexual play, associated with power exchange. Depending on who you ask, the initials can stand for Bondage/Discipline, Sadism/Masochism, Slave/Master, Dominance/Submission. See **"What is BDSM?"** for more info.

**bottom.** Meaning varies by sexual subculture, but generally means either (1) submissive in BDSM or power exchange play, or (2) penetrated partner in anal sex.

**blue balls.** A rare but painful condition that can happen to males. In rare conditions, sufficient arousal for a long time without ejaculation can cause pain in the testes. Important to note that some boys try to use this as an excuse to coerce girls into sex, often lying about experiencing it. Girls can tell guys t simply masturbate to get the release they are looking for.

**clitoris.** A part of a woman's genital area that is usually the most sexually sensitve part of her body. See a **nice diagram** of a woman's genital area.

**escort.** Sometimes used as another word for "prostitute", although there are services providing "escorts" that do not intend to provide sex.

**french.** Personal ad term for "oral sex".

**fisting.** putting a hand completely inside a vagina (vaginal fisting) or anus (anal fisting).

**four twenty (420 / 4-20).** This is NOT a sex word, but its meaning is a common question at our switchboard. It is term used in personal ads to refer to marjiuana (pot) usage or tolerance, although exact meaning varies.

**gay.** No one agrees on an exact definition, but generally speaking it means someone who is attracted to someone of the same sex. See **"Am I gay?"** for more details.

**golden showers.** Sex play that involves urine (pee).

**greek.** Personal ad term for "anal sex".

**gynocologist.** A doctor specializing in female reproductive and urinary organs: vagina, uterus, cervix ovaries, bladder, and other organs in that area.

**hymen.** A thin membrane of skin covering part (not all) of a woman's vaginal canal. A girl's or woman's hymen may or may not be there, and that isn't always because of sex. It used to be thought that the hymen was evidence of whether or not a woman had had sexual intercourse, but that is not true. It can be torn from tampons, exercise, or other non-sexual use. Not even all women are born with intact hymens! For more info, see **"Does it hurt the first time I have sex?"**.